## HAMPSHIRE HOLDING CORPORATION
### v. CREEDON, Housing Expediter.*
### No. 393.

United States Emergency Court of Appeals.

Heard at New York City March 7, 1947.
Decided May 22, 1947.

John D. Masterton, of New York City (John H. Jobes, of Jersey City, N. J., and William Sardell, of New York City, on the brief), for complainant.

Harry H. Schneider, of Washington, D. C. (Carl A. Auerbach, William R. Ming, Jr., Charles P. Liff, Philip Travis, and Marcella R. Schultz, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MA-GRUDER and McALLISTER, Judges.

MAGRUDER, Judge.

Hampshire Holding Corporation, the complainant herein, owns and operates an apartment house in Jersey City, New Jersey. It is therefore subject to the Rent Regulation for Housing (8 F.R. 7322), as applied to the Northeastern New Jersey Defense-Rental Area. For that area, the regulation became effective on July 1, 1942, and it provides that the maximum rent of housing accommodations which were rented on March 1, 1942, shall be "the rent for such accommodations on that date." This is the generally applicable formula, but from the outset the regulation has prescribed various grounds upon which landlords might petition for individual adjustment to increase the maximum rent otherwise allowable. These grounds of adjustment have been added to from time to time, by amendments to the regulation. The present complaint grew out of the denial of an application for adjustment filed by com-

---

* The Housing Expediter has succeeded to the functions of the Price Administrator with reference to rent control. See Executive Order 9809, 50 U.S.C.A. Appendix, § 601 note, 11 F.R. 14281, and Executive Order 9841, 50 U.S.C.A.Appendix, § 601 note, 12 F.R. 2645.

plainant under the so-called "substantial hardship" provisions of § 5(a) (12) of the regulation.

Prior to commencing construction of the apartment house in question, complainant consulted the taxing authorities of Jersey City to find out what the assessed valuation of the improved property would be. As a result, complainant received a letter from the Board of Tax Commissioners, dated May 29, 1940, stating that the sketches had been examined and that "you have our definite assurance that the combined assessment on the completed parcel will not exceed the sum of $87,000."

The building was completed on March 1, 1941, and by the following October had attained normal full occupancy. It is claimed that the rent schedules were established in reliance upon an annual tax bill of approximately $4,000, based upon an assessment of $87,000, but that the apartments could have been rented at substantially increased rentals. For the years 1941, 1942 and 1943, the property was assessed at $87,000. But for the year 1944 the assessors increased the assessed valuation to $215,000. Upon review by the Hudson County Board of Taxation, complainant succeeded in having this assessment reduced to $175,000, and on that basis complainant actually paid a tax for 1944 in the sum of $10,790.50. However, the City has appealed to the State Board of Tax Appeals, seeking reinstatement of the higher assessment of $215,000, and so far as this record discloses such appeal is still pending.

On December 28, 1944, complainant filed its application for adjustment under § 5(a) (12) of the regulation, claiming that its reduction of net income from the property as a result of the unanticipated increased real estate taxes constituted "substantial hardship" within the meaning of the adjustment provision. The Area Rent Director, by order issued August 27, 1945, denied the application on the ground that "no substantial or unavoidable hardship has been sustained". This order was subsequently affirmed upon review by the Regional Administrator.

Thereafter, on January 7, 1946, complainant filed with the Price Administrator its protest against the orders of the Area Rent Director and the Regional Administrator. On June 7, 1946, the Price Administrator issued an interim order in which the attention of complainant was directed to a provision of § 5 to the effect that, in cases under § 5(a) (12), "an adjustment shall not result in a maximum rent higher than the rent generally prevailing in the defense-rental area for comparable housing accommodations on the maximum rent date." By this order the Price Administrator incorporated into the record an affidavit of an OPA rent inspector, fully qualified as an expert in the field. Affiant recited detailed comparisons between the subject apartments and other apartments in the area deemed to be comparable, including one apartment house on the same street which was taken as the primary comparable. After carefully considering the comparable properties as to construction, equipment, location and services, and after making due allowances for differences in detail which might affect rental values, it was affiant's conclusion that the existing maximum rents for complainant's apartment house were higher than the rents generally prevailing on the maximum rent date for comparable accommodations. By way of rebuttal of this affidavit, complainant offered in evidence an affidavit of a licensed real estate broker criticizing the affidavit of the rent inspector in various details; averring that "the alleged comparable properties are not in any wise comparable to the subject premises because their locations, taxes, costs to owner, room size, closet space, and appointments are materially different from the subject premises"; expressing the opinion that "there is no property in Jersey City or Hudson County which is comparable to the subject premises, for the subject premises are ten years newer than any other apartment house in Hudson County in age, construction, layout, appointments and room size"; and calculating that on the basis of larger area alone, without taking into consideration any other factors, the rent of the subject apartments should be increased $8.26 per month per room in order to be put on a parity with the established rents in the apartment house selected by the rent inspector as the primary comparable.

The Price Administrator denied the protest, by order issued November 22, 1946. In an accompanying opinion, the Price Administrator rejected the claim of complainant's expert that there were no housing accommodations in the area comparable to the subject units, citing our opinion in Sirianni v. Bowles, Em.App., 1945, 148 F. 2d 343, 344, in which we said that two housing accommodations may be "comparable", for present purposes, "if they are sufficiently similar so that an expert, taking as a standard the rent prevailing for one, and making allowances for such differences as would be reflected in rental value, would be able to determine the appropriate corresponding rent for the other." After examining in some detail the points of conflict between the two affidavits, the Price Administrator made the ultimate finding "that the protestant has not demonstrated that the maximum rents for the subject apartments are lower than the rents generally prevailing in the defense-rental area for comparable housing accommodations on the maximum rent date." There being, therefore, no margin for adjustment even if it should be found that a "substantial hardship" existed under the facts of this case, the Price Administrator stated that a determination of that question was rendered unnecessary; hence he did not review the correctness of the determination by the Area Rent Director that no substantial hardship had been sustained.

■ After full consideration of the record, we find ourselves obliged to accept the factual determination of the Price Administrator to the effect that complainant had failed to demonstrate that its freeze date rents were lower than the rents then generally prevailing for comparable accommodations in the rental area. Bell v. Fleming, Em.App., 1947, 159 F.2d 416.

■ The principal contention made by complainant in brief and oral argument is that the provision of § 5 of the regulation limiting adjustments for hardship under § 5(a) (12) to the level of comparability is invalid as in conflict with § 2(c) of the Act, as amended by the Stabilization Extension Act of 1944, 58 Stat. 634, 50 U.S.C.A. Appendix, § 902(c). No such objection was contained in the protest, which was directed solely against the orders denying the application for adjustment. As we said in Armour & Co. v. Brown, Em.App., 1943, 137 F.2d 233, 239: "A protest against an order denying an application for an adjustment does not open up for review the validity of the regulation itself, but only raises the question whether the Administrator was arbitrary and capricious in concluding that the applicant had failed to make out a case within the terms of the applicable adjustment provision." Even after the Price Administrator, by the interim order of June 7, 1946, in the protest proceeding, had called attention to this provision of the regulation as a possible barrier to any adjustment in the particular case, complainant did not, so far as appears, challenge the validity of the provision. Section 204(a) of the Act, 50 U.S.C.A.Appendix, § 924(a), provides that no objection to a regulation shall be considered by this court "unless such objection shall have been set forth by the complainant in the protest." However, this provision of the Act is for the protection of the Administrator, to assure that he will not be taken by surprise in this court by objections which he has not had an opportunity to consider in the protest proceedings; and therefore presumably may be waived by the Administrator. Here, in a couple of paragraphs in his opinion accompanying the order denying the protest, the Price Administrator asserted that the comparability limitation upon the measure of adjustment under § 5(a) (12) was consistent with the intent of Congress as disclosed in the language and legislative history of § 2(c) of the Act, as amended, and in keeping also with the freeze date method of rent control. Though the complaint in this court challenged the validity of this provision of the regulation as well as the orders of the Area Rent Director and Regional Administrator, neither in his answer nor in his brief did the Price Administrator raise the technical point that the objection to the validity of the regulation was not properly before us. The objection has been fully argued on the merits, and under the circumstances we deem it proper to dispose of it.

When further extension of the Emergency Price Control Act was before Con-

gress for consideration in 1944, various representatives of real estate interests urged that the provisions for individual adjustment then contained in the rent regulation were too narrowly restricted. This court had previously held, in The Lakemore Co. v. Brown, Em.App., 1943, 137 F.2d 355, that the rent regulation was not invalid for failure to make provision for adjustment of the maximum rent applicable to an individual property where the local authorities had reappraised the particular property and increased its assessed valuation, with the result of increasing the owner's real estate taxes. At both the Senate and House committee hearings, proposals were advocated for writing into the Act a requirement that the Administrator grant individual upward adjustments in hardship cases where the landlord had experienced increases in taxes or other operating expenses since the freeze date. However, neither committee reported any such amendment. The Senate committee expressed its belief that the rent regulation did not make adequate provision for individual adjustments in special hardship cases, but was content to rest upon an assurance by the Administrator "that an amendment to existing regulations will be issued promptly to make more adequate provision for adjustments in such cases." See Sen.Rep.No. 922, 78th Cong., 2d Sess., p. 53. The bill passed the Senate without any change in § 2(c) of the Act. In the House, however, the bill was amended so as to introduce the following language into § 2(c):

"The Administrator shall provide for individual adjustments in those classes of cases where the rent on the maximum rent date for any housing accommodations is, due to peculiar circumstances, substantially higher or lower than the rents generally prevailing in the defense-rental area for comparable housing accommodations, including those cases in which there has been since the maximum rent date a substantial increase or decrease in property taxes or operating costs, or in which the rent is less than the total costs of operation, or in multiple-unit premises the rent is lower than the maximum rent generally prevailing for comparable housing accommodations in the same premises."

The conference committee substantially revised this amendment (see H.Rep.No. 1698, 78th Cong., 2d Sess., pp. 4, 16) and, as so revised, the amendment was enacted into law, as follows:

"Under regulations to be prescribed by the Administrator, he shall provide for the making of individual adjustments in those classes of cases where the rent on the maximum rent date for any housing accommodations is, due to peculiar circumstances, substantially higher or lower than the rents generally prevailing in the defense-rental area for comparable housing accommodations, and in those classes of cases where substantial hardship has resulted since the maximum rent date from a substantial and unavoidable increase in property taxes or operating costs." (58 Stat. 634.)

In explaining the conference report on the floor of the Senate, Senator Wagner, Chairman of the Senate Committee on Banking and Currency, said (90 Cong. Rec. 6367):

"The Senate conferees, however, declined to accept in the House bill an individual adjustment provision which would have opened the door to a flood of applications based on cost increases, and which would have been administratively unworkable and inflationary in effect. In place of this provision a substitute was devised which requires the Administrator to provide by regulation for individual adjustments in classes of cases in which a substantial hardship has resulted since the maximum rent date from substantial and unavoidable increases in taxes and costs. *This will permit the Administrator to restrict, by appropriate adjustment provisions, the granting of relief to those cases which are clearly deserving.*" (Italics added.)

In compliance with the mandate of Congress, the Administrator amended the rent regulation, so as to include a new adjustment provision relating to "peculiar circumstances" (§ 5(a) (11), 9 F.R. 8054), and a new adjustment provision relating to hardship cases, as follows (9 F.R. 10188, 10718):

"Sec. 5. * * *

"(a) *Grounds for increase of maximum rent.* Any landlord may file a petition for adjustment to increase the maximum rent otherwise allowable, only on the grounds that: * * *

"(12) *Substantial hardship from increase in property taxes or operating costs.* Substantial hardship has resulted from a substantial decrease in the net income (before interest) of the property for the current year as compared with a representative period prior to the maximum rent date, due to a substantial and unavoidable increase in property taxes or operating costs."

At the same time § 5 of the regulation was amended by the insertion of an unnumbered paragraph as follows (9 F.R. 10188):

"In cases under paragraph (a) (12) of this section, the adjustment in the maximum rent shall be in the amount the Administrator finds necessary to relieve the substantial hardship: *Provided,* That the adjustment shall not result in a maximum rent higher than the rent generally prevailing in the defense-rental area for comparable housing accommodations on the maximum rent date."

It will be observed that § 2(c) of the Act, as amended, contains no specific direction to the Administrator with reference to the measure of the adjustment to be made in these hardship cases. Presumably this matter was left to the reasonable discretion of the Administrator, under his granted power to prescribe regulations governing the individual adjustments of maximum rents where hardship had resulted from increases in property taxes or operating costs. The comparability limitation which the Administrator has included in the measure of adjustment for hardship cases certainly cannot be said to be unreasonable or inappropriate, for just such a limitation on ad-

justments in hardship cases had previously been written by Congress itself into the District of Columbia Emergency Rent Act, 55 Stat. 788, D.C.Code 1940, § 45—1601 et seq. In § 4(b) of that Act, Congress provided:

"Any landlord may petition the Administrator to adjust the maximum-rent ceiling or minimum-service standard, or both, applicable to his housing accommodations to compensate for (1) a substantial rise, since January 1, 1941, in taxes or other maintenance or operating costs or expenses, or (2) a substantial capital improvement or alteration made since January 1, 1941; whereupon the Administrator may by order adjust such maximum-rent ceiling or minimum-service standard in such manner or amount as he deems proper to compensate therefor, in whole or in part, if he finds such adjustment necessary or appropriate to carry out the purposes of this Act: *Provided,* That no such adjusted maximum-rent ceiling or minimum-service standard shall permit the receipt of rent in excess of the rent generally prevailing for comparable housing accommodations as determined by the Administrator."[1]

As a matter of fact, at several times in the course of the committee hearings on what became the Stabilization Extension Act of 1944, representatives of real estate interests indicated their understanding that any adjustment in hardship cases could not be expected to raise individual maximum rents higher than the generally prevailing level. See Hearings before the House Committee on Banking and Currency, 78th Cong., 2d Sess., on H.R. 4376, pp. 685-6, 688, 2207; Hearings before the Senate Committee on Banking and Currency, 78th Cong., 2d Sess., on S. 1764, pp. 848, 866, 1061. Several approving references were made to the provision for hardship cases contained in the District of Columbia law.

[1] Under the District Act, the Administrator of Rent Control is not vested with authority to issue substantive regulations; Congress directly prescribed the generally applicable formula for determining maximum rents and the detailed adjustment provisions for exceptional cases. Under the Price Control Act, Congress did not itself establish rent control, but delegated to the Price Administrator the power to impose rent controls by regulation or order. It was natural, therefore, that Congress, when it amended § 2(c) of the Act in 1944, did not prescribe the measure of adjustment in hardship cases but left this detail to be provided for by amendment to the rent regulation.

See House Hearings, supra, at 651, 1392-3, 1829, 2463-4.

When the Price Control Act came before Congress for further extension in 1945, representatives of the Office of Price Administration fully explained to the legislative committees the action which the Administrator had taken to comply with the requirement of § 2(c) of the Act, as amended. The criteria for adjustment, including the comparability limitation, were specifically referred to. See Hearings before the Senate Committee on Banking and Currency, 79th Cong., 1st Sess., on S.J.Res. 30, pp. 97-9, 612; Hearings before the House Committee on Banking and Currency, 79th Cong., 1st Sess., on H.J.Res. 101, pp. 84-5. The Industry Advisory Committee recommended that comparability should not be the limit of adjustment in hardship cases. See Senate Hearings, supra, at 415. Congress, however, extended the Act for another year without making any further changes in § 2(c). 59 Stat. 306.

It is our conclusion that the Administrator was fully authorized by law to prescribe as he did in § 5 of the rent regulation that adjustments under § 5(a) (12) "shall not result in a maximum rent higher than the rent generally prevailing in the defense-rental area for comparable housing accommodations on the maximum rent date."[2]

A judgment will be entered dismissing the complaint.

34 C.C.P.A. (Patents)

[2] The comparability limitation follows the pattern of other adjustment provisions in the regulation. The limitation is also in keeping with the freeze date method of rent control, as stated by the Price Administrator in his opinion: "To be eligible for upward adjustment of rent on the basis of increased property taxes or operating costs, the circumstances must be such as to indicate that, in a normal economy, the tax or operating cost increase is one which the landlord could have passed on to the tenants. Presumably, in such an economy, landlords affected by a tax or operating cost increase could have passed the additional burden on to the tenants only to the extent of bringing the rents up to the level of the rent generally prevailing for comparable accommodations; for, in a free rental market, the bargaining power of the landlord is limited by the amount for which tenants are able to procure comparable accommodations elsewhere in the area. Thus, to limit adjustments under Section 5(a)(12) to the level of the generally prevailing rental for comparable accommodations in the area is in keeping with the method of rent control which seeks to preserve the bargains which landlords and tenants worked out for themselves in a free rental market. To grant adjustments under Section 5(a)(12) over and above that level would be to give rise to a serious question of discrimination against landlords compelled to abide by their frozen rents."