### BOND et al. v. PINCHOT.

### PINCHOT v. BOND et al.

Nos. 778 and 779.

Municipal Court of Appeals for the District of Columbia.

May 9, 1949.

---

C. Walter Harris and Edward E. O'Neill, both of Washington, D. C., for Bond and Harrover.

Irving J. Levy, of Washington, D. C. (Joseph L. Rauh, Jr., of Washington, D. C., on the brief), for Pinchot.

Before CAYTON, Chief Judge, and HOOD and CLAGETT, Associate Judges.

CLAGETT, Associate Judge.

The principal issue presented by this appeal is whether a $2,000 payment by a tenant to a landlord was rent or whether such payment constituted an accord and satisfaction in a dispute over which party should pay for the installation of a new furnace in the rented premises. Other questions involve whether and in what amounts the landlord is liable to the tenant for alleged refusal to supply heat and repair the roof. All questions arise under the District of Columbia Emergency Rent Act.[1]

Plaintiffs below were partners conducting a rooming house business at 1617 and 1619 Rhode Island Avenue, N. W., two large houses previously owned by former Governor Pinchot and owned at the time of this suit by his widow, Mrs. Cornelia Bryce Pinchot. Plaintiffs sued Mrs. Pinchot for double the $2,000, which plaintiffs claimed represented an overpayment of rent. They also sued her for an alleged violation of the minimum service standard on the theory that by failure to promptly replace a furnace the landlord had caused the premises to be unheated and made it necessary for plaintiffs to refund to roomers $108 on account of their room rent. Plaintiffs likewise claimed twice the amount spent by them in repapering and repainting walls and making other repairs which they said had been necessitated by leaking roofs. The trial court disallowed the $2,000 item and also the item claimed on account of lack of heat but allowed the claim on account of the roof to the extent of $79 doubled. Plaintiffs have appealed—No. 778 —from the denial of the first two items as well as for error claimed by reason of the alleged insufficiency of the judgment on the roof item; defendant, Mrs. Pinchot, has cross-appealed—No. 779—from the judgment against her on the roof item.

Plaintiffs' first claim—that for twice the $2,000 which they urged was a rent overpayment made to Mrs. Pinchot—involves two directly conflicting theories of the purpose of such payment. Both theories are based upon the following chain of circumstances, which we believe it necessary to recite in some detail. On January 1, 1941, the test date under the Rent Act, 1619 Rhode Island Avenue was rented to another tenant under a written lease providing, among other things, that the lessee would make at her own expense all inside repairs that might be necessary or which she

---

[1] Code 1940, Supp. VI, § 45—1610(a).

might desire during the duration of the lease.

In August 1943 the same lessee filed a petition with the Rent Administrator for appropriate relief based upon the claim that the furnace in the premises was worn out and would not carry heat above the second floor of the five-story building. After hearing, a rent examiner denied the relief requested based upon a finding of fact that the minimum-service standard for this housing accommodation in the light of the covenant in the lease imposed no obligation on the landlord to correct the defective heating system. No appeal was taken from that order.

After plaintiffs took over operation of the premises in 1944, without a written lease, the controversy over responsibility for repairs including repair of the furnace was resumed. In February 1947 plaintiffs complained to the District of Columbia Health Department about the condition of the furnace and in consequence a notice was served upon Mrs. Pinchot by the Health Department which in effect required replacement of the old furnace. Still claiming that plaintiffs were liable for this expense, Mrs. Pinchot obeyed the order of the Health Department and installed a new furnace at a total cost of approximately $2,500. In May 1947 Mrs. Pinchot petitioned the Rent Administrator, because of the expense incurred in installing the new furnace, to permit her to increase the rent on 1619 Rhode Island Avenue to $300 a month from the existing rent of $225 a month. A rent examiner found that the new furnace installation constituted a capital improvement and warranted an adjustment in the maximum rent ceiling. However, he allowed only $20 a month increase. Plaintiffs paid this increased rent for two months.

Prior to replacement of the furnace, or on January 2, 1947, plaintiffs wrote Mrs. Pinchot stating they wanted to sell their rooming house business and asked permission to submit the names of prospective tenants for her approval. On two different occasions Mrs. Pinchot refused on any condition to give any lease to persons who might purchase plaintiffs' business. Plaintiffs continued their efforts, however, and in July 1947 Mrs. Pinchot's representative informed plaintiffs' representative that Mrs. Pinchot "does not feel that she can make a lease on the property unless she is paid $2,500, her out-of-pocket expense for the replacement of the furnace at 1619 Rhode Island." Negotiations on this basis followed and finally plaintiffs, while denying liability, agreed to pay Mrs. Pinchot $2,000 as settlement in full of her claim for the furnace replacement cost, and Mrs. Pinchot agreed to give to the purchaser of plaintiffs' rooming house business a one-year lease on both houses. The $2,000 was paid and the lease executed. At the time this arrangement was made Mrs. Pinchot signed a "release" reciting the receipt of the $2,000 "as settlement in full of my claim for the replacement costs of the furnace installed by me in premises 1619 Rhode Island Avenue, N. W." and "subject to the execution of a mutually satisfactory lease" with the prospective tenant covering 1617 and 1619 Rhode Island Avenue.

Based on the foregoing facts defendant urges that the $2,000 payment was paid solely as a compromise settlement in the furnace dispute. Plaintiffs urge on the contrary that it constituted rent and that since it was collected in addition to the legal rent they are entitled to recover twice that amount under the Act. The trial court held that the payment was not rent but instead was in the nature of an accord and satisfaction.

"Rent" is defined by the Act as " * * * the consideration, including any bonus, benefit, or gratuity, demanded or received * * * for the use or occupancy of housing accommodations or the transfer of a lease for such accommodations."[2]

While we believe the trial court could have reached a contrary conclusion, we are unable to determine that the conclusion it did reach was clearly erroneous.[3] In so deciding we have in mind that the terminology adopted by the parties in

---

[2] Code 1940, Supp. VI, § 45—1611(c).

[3] Edwards v. Woods, 8 Cir., 168 F.2d 827.

reaching their agreement is not important since "mere words and ingenuity of contractual expression, whatever their effect between the parties, cannot by description make permissible a course of conduct forbidden by law."[4] Ordinarily "rent" is paid for the use or occupancy of housing accommodations by the person who is to enjoy such use and occupancy. Here the $2,000 was paid by the outgoing tenants at the end of their tenancy, and there is no evidence in the record that any part of this amount was paid by the incoming tenant who obtained a one-year lease from the landlord. How much was paid by the incoming tenant to the outgoing tenants for the purchase of the rooming house business is not disclosed by the record, but it can be inferred from the testimony that whatever that consideration was had been agreed upon prior to the closing of the transaction between plaintiffs and defendant. Furthermore, there is every indication in the record that Mrs. Pinchot really believed that she was entitled to recover from plaintiffs $2,500 spent by her for the replacement of the furnace which had finally become worn out during the tenancy of plaintiffs. Whether she could have recovered this amount in a suit at law we can not and need not determine, but support for her position was given by the previous determination of a rent control examiner that it was not the duty of the landlord to repair the furnace. Added weight was given to her position by the fact that prior to the replacement of the furnace she refused unconditionally to give a lease on the premises to a third party at the solicitation of plaintiffs. While the motive which led plaintiffs to pay the $2,000 may have been, and probably was, the obtaining of a lease for the third party so that the rooming house business could be sold to that party, it seems equally clear that the motive on Mrs. Pinchot's part was to obtain as much as possible of the $2,500 spent by her in replacing the furnace and which she believed it was the duty of plaintiffs to pay. All of these considerations support the view taken by the trial court and, as already indicated, we do not feel justified in holding that such conclusion was plainly wrong as we would have to do to reverse its decision.[5] On this part of the case, therefore, we affirm the judgment.

### Failure to Heat

Plaintiffs claimed that because of the bad condition of the furnace and the consequent lack of heat they refunded $108 of room rent to certain roomers. This claim was denied by the trial court. The statute provides that a tenant entitled to a minimum-service standard may recover in "an action for double the value of the services refused in violation of the applicable minimum-service standard or for $50, whichever is greater * * *."[6] Plaintiffs claim error because the trial court dismissed the claim without requiring defendant to put on her defense. We believe the plaintiffs failed to make out a prima facie case and hence that the dismissal was proper. As we said in Evans v. Schlein, D.C.,Mun.App., 61 A.2d 32, the remedy is a statutory one, and the Rent Act must be relied upon for the remedy as well as the standards of recovery. Here there was no evidence that the minimum-service standard included furnishing heat by the landlord. On the contrary a previous decision by the rent control examiner was that the minimum-service standard for these premises did not include any repairs within the building. While plaintiffs as landlord of the roomers may have been required to furnish heat to such roomers, it does not follow that the same duty was laid upon the owner of the premises. Furthermore, there was no testimony as to any relation between the amounts refunded to roomers and the value of the services alleged to have been refused by Mrs. Pinchot. On this item, also, the ruling of the trial court must be affirmed.

### The Roofing Claim

Plaintiffs allege that the minimum-service standard included repairs to the roofing

---

[4] Porter v. Fiske, 74 Cal.App.2d 332, 171 P.2d 971, 973, quoting from United States v. City and County of San Fran-cisco, 310 U.S. 16, 28, 60 S.Ct. 749, 84 L.Ed. 1050.

[5] Code 1940, Supp. VI, § 11—772(c).

[6] Code 1940, Supp. VI, § 45—1610(a).

by Mrs. Pinchot and that they had reported to her or her agent on numerous occasions that the roofing over various bay windows leaked. They introduced evidence of various amounts spent by them, not in repairing the roofing but in repapering, repainting and making other repairs, which they claimed were necessitated by the leaks. The amounts claimed by them considerably exceeded the amount awarded by the trial court, which was twice $79, which it found was for repairs made in consequence of the leaks. The landlord claimed she had never refused to do the roofing repair work and on the contrary had spent large sums in such repairs whenever leaks were reported.

 We believe there was substantial evidence to support the view that the minimum-service standard for these premises included the making of repairs to the roof by the landlord and that there was also substantial evidence to support the view that the repairs were refused. We do not believe that a refusal, as contemplated by the Act, need be explicit. A repeated failure to perform a duty may, we believe, be equivalent to a refusal. We reach a different conclusion, however, as to the items which may be considered in arriving at "value of services refused" under the Rent Act. As we have noted above, where a suit is brought under the Act, that Act must be relied upon for the remedy as well as the

standards of recovery. The usual method of valuing services rendered or refused in connection with a leasehold is the difference between the rental value of the premises with and without the services.[7] The amount sought to be recovered by plaintiffs was in the nature of consequential damages, and we are clear that consequential damages are not to be included in arriving at the "value of services refused" under the Rent Act. The authors of that Act foresaw the difficulties in many cases of proving the value of services refused, and hence authorized the recovery, in such event, of $50. In view of the finding by the trial court that the minimum-service standard included the repair of the roof, and the further finding that such services had been refused, we conclude that plaintiffs are entitled to recover of defendant on this account the sum of $50.

 Since the evidence and the law clearly support an award of $50 on this account, the judgment of the lower court will be affirmed provided plaintiffs within ten days hereof file with the clerk of this court a remittitur in the sum of $108; otherwise the said judgment shall be reversed as to this item and the cause remanded for further proceedings not inconsistent with the opinion of this court.[8]

Affirmed in part, reversed in part.

[7] Bell v. Fleming, Em.App., 159 F.2d 416; Benenson Realty Corp. v. Porter, Em.App., 158 F.2d 163; Homewood Development Co. v. Bowles, Em.App., 148 F.2d 850; cf. 3 Sedgwick, Damages, 9th Ed., §§ 984, 991.

[8] Lalley v. Escoett, 79 U.S.App.D.C. 306, 146 F.2d 667; United States v. Certain Parcels of Land, in Rapides Parish, 5 Cir., 149 F.2d 81; United States v. Brookridge Farm, 10 Cir., 111 F.2d 461.